UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ROBERT FIGUEROA,

                   Petitioner,         04 Civ. 3190(GBD)(DFE)

        -against-           <u>REPORT AND RECOMMENDATION</u>
                                        <u>TO JUDGE DANIELS</u>
JAMES CONWAY, Superintendent of
Attica Correctional Facility,

                   Respondent.
------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

     Robert Figueroa's habeas corpus petition challenges his
conviction for rape and attempted murder of a woman I shall call
"Ms. S" to respect her privacy.  **I direct Mr. Figueroa and the
Bronx District Attorney's office to use the abbreviation "Ms. S"
in all further papers in this habeas proceeding.**

     At the 1998 trial before Justice Barbara F. Newman in
Supreme Court, Bronx County, the defendant testified as follows.
He and Ms. S had a son born in 1993.  In November 1995, she left
and took their son.  Figueroa soon petitioned Family Court for
custody of the boy.  The custody battle was still ongoing as of
August 24, 1996.  On that morning, Ms. S brought the son to
Figueroa's apartment for a Court-ordered weekend visit.  Figueroa
conceded that they had sex while the little boy was in the next
room, but claimed Ms. S consented.  He denied her testimony that
he hit her, choked her, and rendered her temporarily unconscious.

     The jury found Figueroa guilty.  Justice Newman sentenced
Figueroa to a term of 10 to 20 years on the attempted murder

count and a consecutive term of 8 to 16 years on the rape count.

For reasons outlined below, I recommend that Judge Daniels deny Figueroa's habeas petition.

Figueroa was represented by Ira Brown, Esq. during the suppression hearing, by Lynn Calvacca, Esq. during the trial, and by Michael Torres, Esq. during the sentencing.  The trial judge later wrote:

> On September 28, 1998, defendant filed a Notice of Appeal.  After filing this notice, defendant was provided successively with three separate appellate attorneys and several enlargements of time in order to perfect his appeal.  On December 21, 2000, the First Department ordered defendant to file his *pro se* brief on or before January 29, 2001.  [He finally did so in July 2002, after making an October 2001 *pro se* motion under New York Criminal Procedure Law ("C.P.L.") § 440.]

(See Justice Newman's May 14, 2002 Decision, p. 3; a copy is Exh. A to the Petition in our Court.)

Rejecting the three appellate attorneys, Figueroa handled his direct appeal *pro se*.  *See People v. Figueroa*, 304 A.D.2d 475, 759 N.Y.S.2d 41 (1st Dept. 2003), *lv. denied*, 100 N.Y.2d 561, 763 N.Y.S.2d 818 (Table) (Ct. App. 2003).

### Exhibits in our Court

In our Court, the Petition was filed by Ronald Cohen, Esq. In April 2004, the attorney-client relationship broke down, so I

granted Mr. Cohen's request to withdraw.  (See my Memorandum and
Order dated January 19, 2005.)  Since then, Figueroa has again
proceeded *pro se*.  The Petition annexed Exhs. A-E, which were not
in chronological order.  In June 2004, ADA Lynetta St. Clair
filed an Affidavit in Opposition that annexed Exhs. 1-7.  I shall
now describe all twelve exhibits in chronological order.

Exh. 1 is an October 1, 2001 *pro se* motion to vacate the
trial verdict under C.P.L. § 440.

Exh. 2 is ADA Blira-Koessler's April 2002 Affirmation in
Opposition to the C.P.L. § 440 motion.

Exh. A is Justice Newman's May 14, 2002 Decision and Order
denying the C.P.L. § 440 motion.

Exh. D is Figueroa's *pro se* brief to the Appellate Division.

Exh. 3 is Appellate Division Justice Luis A. Gonzalez's
August 8, 2002 denial of Figueroa's application for leave to
appeal from the May 14, 2002 trial court decision.

Exh. E is ADA DiPalo's February 2003 brief to the Appellate
Division.

Exh. B is the Appellate Division's April 24, 2003 decision
affirming the trial court's judgement.

Exh. 4 is Figueroa's May 15, 2003 *pro se* application for
leave to appeal from the April 24, 2003 decision.

Exh. 5 is Figueroa's June 17, 2003 *pro se* submission to
Judge Graffeo (enclosing copies of his past attempts to obtain

his Family Court records).

Exh. 6 is ADA DiPalo's June 26, 2003 letter to Judge Graffeo, opposing Figueroa's application for leave to appeal.

Exh. C is Judge Graffeo's June 26, 2003 denial of leave to appeal.

Exh. 7 is a short letter from Robert Cohen, Esq. to the Bronx District Attorney dated June 9, 2004, offering to give more particulars concerning the terse allegations in the habeas petition he had recently filed in our Court on behalf of Figueroa.

NOTE: More recently, the District Attorney's office faxed me a copy of a 9-page decision by Justice Newman dated March 28, 2005, denying a second 440 motion brought by Mr. Cohen.  I have annexed a copy of that decision at the end of this Report.


## The state court transcripts


In November 2004, ADA St. Clair filed the following transcript volumes.  The clerk's office did not docket them in chronological order, which would be as follows:

Docket Item # 12 (pp. 1-30) January 14, 1998, *Huntley* hearing.

Docket Item # 11, (First part, pp. 1-199) May 12, 13 and 14, 1998, *Molineux* hearing; beginning of jury selection.

– 4 –

Docket Item # 10, (First part, pp. 200-367) May 18, 1998, decision on *Molineux* issue; jury selection continued.

Docket Item # 10, (Second part, pp. 368-551) May 19, 1998, trial -- supplemental *Molineux* colloquy after the parties reviewed certain Family Court documents; opening statements and most of the People's witnesses.

Docket Item # 16, May 19, 1998. (This volume duplicates Docket Item # 10, Second part, but with different pagination.)

Docket Item # 10, (Third part, pp. 552-651) May 20, 1998, trial -- the People's case continued.

Docket Item # 15, May 21, 1998, trial -- the People's last two witnesses, testimony of defendant. (This volume's pagination should have begun as page 652, but instead it restarts as page 1 and goes to page 146.)

Docket Item # 10, (Fourth part, pp. 652-786) May 26, 1998, trial -- colloquy, summations, instruction and verdict.)

Docket Item # 13, May 26, 1998. (This volume duplicates part of Docket Item # 10, Fourth part, but with different pagination.)

Docket Item # 14, (pp. 368-786) (This volume duplicates Docket Item # 10, Second, Third and Fourth parts.)

Docket Item # 17, September 25, 1998, sentencing. (At that stage, Figueroa was represented by Michael Torres, Esq.)

### **The trial evidence**

Ms. S testified at Tr. 405-549 as follows.  Pursuant to a Family Court order, she arrived at Figueroa's apartment lobby to turn over their 3-year old son for a weekend visit on Friday, August 24, 1996 at 9:45 a.m.  Figueroa refused to come downstairs to the lobby, so Ms. S and the boy rode the elevator up to the apartment.

Once they arrived at the apartment, Figueroa told the 3-year old boy to stay in the living room.  He forced Ms. S into a bedroom; she struggled with him, but he forced her to have sex with him vaginally and orally.  Figueroa then grabbed her and choked her until she passed out.  When she regained consciousness, she was unable to breathe until she removed a clinging plastic wrap that covered her head, and until she removed something lodged in her mouth.  Once she was breathing, she discovered that she was alone in the apartment.  She was unable to find her clothes and her rings (they were never recovered).  She dressed in some of Figueroa's clothes.  She called 911 from his apartment at 10:57 a.m. (see 5/21/98 Tr. 57).  The police did not come immediately, and so she left the building by climbing down the fire escape for five floors.

On the street she saw Figueroa with their son; Figueroa ran toward her.  She hailed a livery cab, took it to the 46th

Precinct station house, and reported that Figueroa had raped her.
Ms. S's testimony also told the jury about previous beatings
suffered at the hands of Figueroa, and about ongoing Family Court
proceedings, orders of protection and Figueroa's visitation
rights as to their child.

Police Officer Thomas Delvecchio testified at Tr. 557-651 as
follows.  Pursuant to Ms. S's 911 call (and unaware that she had
gone to the station house), Delvecchio and his partner arrived at
the apartment building.  He looked into the lobby and saw
Figueroa and the boy at the elevator's open door.  Figueroa was
stuffing what looked like a plastic dry-cleaning bag into a space
in the elevator shaft between the floor of the lobby and the
elevator car.  He also attempted to put some type of sling onto
his arm.  At this point, Figueroa made his way to the front door
and let Delvecchio into the lobby.

Figueroa was sweating very heavily and his face had
scratches which appeared to still be bleeding.  He stated that
he was sure that Ms. S had called 911, and he said in substance
that she was probably harassing him once again.  Delvecchio then
went with Figueroa up to the fifth floor.  Not sure whether Ms. S
was in Figueroa's apartment, Delvecchio knocked on the door and
called to be let in.  Figueroa claimed that the door had been
locked from the inside, and that he did not have a key to his own
apartment.  Figueroa went on to say that he and Ms. S had argued

that day, but that the argument happened on a lower floor, in the apartment of his mother.  He claimed that this could be verified by his mother.  He produced a key to his mother's apartment and let Delvecchio look inside, but the mother's apartment was empty. (On cross-examination at trial, Figueroa conceded that his mother was in Atlantic City on that day; he asserted that he had been unaware of this when he spoke with Delvecchio.  5/21/08 Tr. 105-06.)

Delvecchio was convinced that Ms. S was no longer in the building, so he started to drive back to the station house.  Upon arrival, Delvecchio discovered that Ms. S was there.  Delvecchio met with her briefly.  She was hysterical and very upset, and she soon left for Bronx Lebanon Hospital.[1]

After this meeting, Delvecchio proceeded directly back to Figueroa's building.  He found Figueroa coming down a stairwell into the lobby and he arrested him.  That same day, after receiving the *Miranda* warnings, Figueroa wrote and signed a statement that Ms. S had sex with him at her consent.  At Tr.

---

[1]     Wayne Langmore, M.D. testified at 5/21/98 Tr. 2-49 as follows.  He examined Ms. S at 1:30 p.m.  She had bruises on both forearms, wrists and inner elbows.  She had scrapes to a thigh, a forearm, and both knees; the scrapes were consistent with her testimony (Tr. 440-41, 544-45) that she had been dragged along a rug.  She had tenderness in her neck.  A gynecological exam was conducted by another doctor.  Dr. Langmore conceded that the gynecological report showed no vaginal tears or bruises, and no sperm, but he explained that this was not unusual in rape cases.

572-74, this detailed statement was received as an exhibit and it was read to the jury.[2]

The following day, Delvecchio went to Figueroa's building and climbed down a ladder to the bottom of the elevator shaft; it was clean except for two items, which were received as exhibits: a black elastic strap, and a clear plastic dry-cleaning bag. (Tr. 559-68, 579-81.)

Figueroa testified at 5/21/98 Tr. 64-145 as follows.  He contended that Ms. S was framing him so that she could win their custody battle.  He conceded that, earlier in 1996, he had been

_____

[2]   At Tr. 573-74, the full statement was read to the jury as follows (I have redacted Ms. S's full name and made a short ellipsis at the second line):
> Ms. S came to my apartment about 9 a.m.  She brought my son . . . for temporary visitation.  We talked about her not bringing my son on Tuesday at 6 p.m. as the visitation is stated by the Family Court.  After we talked, we had sex at her consent.  Then she went home or wherever.  She goes on Saturday.  Before noon I went to my mother's apartment so she can see her grandson and go to the park down the block.  I met the officer in the lobby and he told me there had been a disturbance in my apartment.  I offered him to come to my mother's apartment.  Then we can come up to my apartment.  He knocked on the door from the person who made the complaint.  No one answered.  He took a look at the entrance and saw nothing happening.  Then they left.  After I was speaking to another tenant, I left to take my son to the park when the first officer came back and arrested me.  I have had surgery on my left shoulder, which was a rotating curvature.  A very painful operation.  Under strong medication.  I have no use on my left shoulder or my arm.  I'm an accounting clerk working for a publishing company for eight years.  Performance rating of excellence.  I'm a working individual and would not jeopardize my job for anyone or anything.  In the past, Ms. S has been trying to stop me from winning the custody battle for which I am the petitioner.  She has been trying to have me arrested for a very long time.  All I ask is to be with my son until the court battle has ended.  Thank you for your time and understanding.  Robert Figueroa.

served with a Family Court Order of Protection that was issued at her request.  He also conceded that he was upset that Ms. S had failed to bring the boy to him on August 21, 1998 for a Court-ordered visit, and that he complained about that when she brought the boy on August 24.  Nevertheless, he claimed that she agreed to have sex with him.  He said he was physically incapable of manhandling her, because of painful surgery on his rotator cuff eight days earlier.  The jury saw photos of the scratches on his face; he said he sustained those on August 22 or 23 when he worked on his car and pulled out the plastic on the dashboard. (The prosecutor's summation argued that such exertion belied his claim that the surgery had weakened him, Tr. 719.)

The jury also saw photos of the bruises and cuts on various parts of Ms. S's body, including cuts on her knuckles which corroborated her testimony that he tore off her rings.  (See Tr. 707, and see her testimony at Tr. 411-12, 418.)  The defense summation offered an explanation that perhaps Ms. S acquired those cuts and bruises while she rushed down the fire escape. (Tr. 695.)

In short, Figueroa's defense was a "tough sell."  He claimed that Ms. S consented to the sex but, less than an hour later, maliciously went to the police and reported it as rape.

## **The Petition as amended**

On November 9, 2004, I granted a temporary *Zarvela* stay of this habeas proceeding.  (Docket Item # 9, see also # 7 and # 8.) By February 7, 2005, Figueroa was proceeding *pro se*; he wrote to me (Docket Item # 20) that he wanted to continue the *Zarvela* stay, and to continue presenting an additional claim to the state courts.  Nine months later, by letter dated November 14, 2005, Figueroa informed me that he had exhausted his state court remedies.  (Docket Item # 21.)  ADA Nancy Killian answered that new claim with a very short letter dated December 1, 2005. (Docket Item # 23.)

Pursuant to my Memorandum and Order dated November 9, 2004 (Docket Item # 9), the petition before our Court is deemed to insert a new Ground Six and to read as follows:

GROUND ONE

16. Petitioner's second degree attempted murder conviction was based, in substantial part, on uncorroborated hearsay and, therefore, the crime was not proved beyond a reasonable doubt.

17. The hearsay evidence produced during petitioner's trial was insufficient to permit

a rational trier of fact to find petitioner
guilty beyond a reasonable doubt.

18. Petitioner's [s]econd [d]egree
[a]ttempted [m]urder conviction violated his
rights to due process of law under the 5th,
6th and [] 14th Amendments to the
Constitution of the United States.

GROUND TWO

19. The employment of hearsay and reference
to persons, documents or things that were not
produced at the trial denied petitioner a
fair trial and due process of law.

20. Petitioner's rights under the 6th and
14th Amendments to the Constitution of the
United States were violated by his being
denied the right to examine and confront
witnesses and evidence referred to during the
trial but which were not produced at trial.

GROUND THREE

21. Petitioner[] was denied due process of
law and a fair trial due to the failure [of]
the prosecution to produce material as
required by the doctrine of *Brady v.
Maryland*, 3[7]3 U.S. 83 (1963)[,] violat[ing]
the right to due process of law under the 6th
and 14th Amendment[s] to the Constitution of
the United States.

GROUND FOUR

22. Petitioner's right to confrontation was
violated by the District Attorney's failure
to disclose[] material that bore on the
credibility of the State's witnesses.

23. Petitioner's right to confrontation was
violated by the reception into evidence of
hearsay testimony.

24. Petitioner's right to confrontation
through cross-examination under the 5th, 6th
and 14th Amendment[s] to the Constitution of

the United States were violated and
petitioner was deprived of a fair trial.

GROUND FIVE

25. Petitioner's rape conviction is infected
by the constitutional infirmities that infect
the attempt[ed] murder conviction and, for
the reasons stated in grounds One, Two,
Three, Four, Six and Seven violated his
rights under the 5th, 6th and 14th Amendments
to the Constitution of the United States.

GROUND SIX

26. That petitioner's right to due process of
law was violated by the conduct of the trial
justice in that Justice Barbara Newman, post
her conduct of a *Molineux* hearing[,] caused
petitioner's case files at the Family Court
to be investigated.

27. The trial court, by conducting an
investigation, prejudiced petitioner's right
to a fair and impartial trial by acting on
the basis of information that was (a) not
presented in the course of the hearing or
trials; (b) not part of the adversarial
process in that it was obtained, reviewed and
received ex parte from the court's
investigator; and (c) adversely affected the
court's impartiality.

28. A trial is not an investigation and the
role of the court is not, outside the trial
or the evidence, conducting its own
investigation of an accused.

29. This extra-judicial conduct renders
petitioner's trial fundamentally unfair.

GROUND SEVEN

30. That petitioner's right to counsel under
the 6th Amendment [to] the Constitution of
the United States was violated due to trial
counsel's ineffectiveness in that trial
counsel failed to:

- 13 -

(a) conduct an investigation of the
facts and circumstances and thereby failed to
identify and develop petitioner's best
defense;
(b) subpoena documents and things
readily available from the Clerk of the
Family Court and/or obtain *Brady* material;
(c) obtain transcripts of the Family
Court proceedings; and
(d) identify and subpoena witnesses by
reason of his failure to obtain the Family
Court files and/or *Brady* material.

## DISCUSSION

Except for Ground Six, all of these grounds were presented

on direct appeal.  The Appellate Division unanimously ruled as

follows:

Defendant's ineffective assistance of
counsel claim rests primarily upon factual
assertions that are outside the record, and
that he made in his unsuccessful post-
conviction motions to vacate the judgment
pursuant to CPL 440.10.  However, since leave
to appeal to this Court was denied, these
assertions are not properly before this Court
[citations omitted].  The existing record
before us establishes that defendant received
meaningful representation [citations
omitted].
Defendant was not entitled to be present
when the victim conferred with her attorney.
While a defendant has a statutory right to be
"personally present during the trial of an
indictment" (CPL 260.20), the victim's
meeting with her attorney was not part of
defendant's trial.
Defendant's remaining contentions are
unpreserved and we decline to review them in
the interest of justice.  Were we to review
these claims, we would reject them.

Exh. B; *People v. Figueroa*, 304 A.D.2d 475, 759 N.Y.S.2d 41 (1st Dept. 2003).

The Appellate Division ruled that most of the claims were unpreserved; therefore, Figueroa cannot bring them to our Court unless he shows "cause" for the lack of objection, as well as "prejudice" or "a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 752-53, 111 S.Ct. 2546, 2566 (1991).

Nevertheless, I will discuss the merits of each ground.  As will be seen, the prosecutor and the judge did not do anything unfair, and therefore any objections would have lacked merit.

**Ground One**

The petition's Ground One argues that his conviction was based in "substantial part" on uncorroborated hearsay, and that the evidence was insufficient to permit a rational trier of fact to find him guilty beyond a reasonable doubt.  This is untrue. The jurors heard very little hearsay.  Their verdict was based on the eyewitness testimony of Ms. S, corroborated by photos of cuts and bruises on her body, and scratches on his face, and the eyewitness testimony of Officer Delvecchio that Figueroa was bleeding from the scratches and was stuffing the dry-cleaning bag down the elevator shaft.

**Ground Two**

Ground Two alleges that hearsay evidence violated the defendant's right to confront witnesses against him.  The hearsay

is not specified in Figueroa's petition, but it was specified in
his direct appeal (Exh. D pp. 8-17).  There, he complained about
Ms. S's testimony concerning (a) her understanding of the Family
Court orders, and (b) what she heard from her babysitter.

In general, the Family Court proceedings were helpful to the
defense.  They provided the defense with its only argument as to
why Ms. S would consent to sex but then falsely charge rape.
This argument was made as early as the post-arrest statement (Tr.
573-74), where Figueroa wrote:

> ...  In the past [Ms. S] has been trying
> to stop me from winning the custody battle
> for which I am the petitioner.  She has been
> trying to have me arrested for a very long
> time.  ...

At the start of trial, defense counsel's opening statement
said, at Tr. 396:

> I submit to you, ladies and gentlemen,
> that the witness in this case, the only
> witness in this case[,] Ms. S[,] is using the
> criminal justice system in order to gain full
> custody of her son.  ...  Is she using [her
> son] as a pawn?  You have to decide that.

On direct examination, Ms. S made only three references to
the Family Court.  (Tr. 421-24, 439-40, 441.)

During cross-examination, defense counsel asked Ms. S the
following four questions (the answers to the first four questions
were never stricken):

> Q.  Let's go to August 24, 1996, the
> date of this charge.  All right.  According
> to the court order you have every other

- 16 -

weekend to bring your son to his father; is
that correct?
    A.  Yes.
    Q.  And part of -- Was the court order
indicating that you, yourself, had to do this
or could anyone bring [your son] to his
father?
    A.  I had to take him.
    Q.  And, before this particular date you
had been in Family Court with respect to
charges against Robert, correct?
    A.  Correct.
    Q.  And, the Judge that ordered you to
bring your son yourself to Robert, was that
the same Judge who said you were the one to
have to bring him to Robert?
    A.  Yes, it was.  It was the same Judge
before.
    Q.  So, what you're saying is that the
Judge who had heard your allegations about
this --
    THE COURT: Could we just go to the
sidebar for a minute, please.  Off the
record.

(Tr. 497-98.)

    Defense counsel's questions implied that, if Ms. S had
actually been afraid of defendant, then she would have delegated
someone else to deliver the 3-year old boy.  Defense counsel's
questions also invited the jury to speculate about what the
Family Court Judge had been thinking.  If the Family Court Judge
ordered Ms. S to deliver the boy personally, then one might
speculate that the Family Court Judge disbelieved Ms. S's
allegations of abuse and threats.

    In the robing room conference (Tr. 498-503) Justice Newman
said that the complete Family Court records might show "other
things . . . that necessitated the arrangement" about delivering

- 17 -

the boy.  (Tr. 499.)  She said that "an unfair spin" might be
"communicated to this jury" unless the jury was informed about
all the Family Court orders about delivering the boy.  (Tr. 500.)
ADA Perez then said:

> MS. PEREZ:  ...  I'm going to re-direct
> on this and I'm glad she went into it.  The
> child was supposed to be picked up by the
> babysitter.
> MS. CALVACCA:  Oliva.
> MS. PEREZ:  From her babysitter.  The
> babysitter refused to do this any longer,
> because she had had enough of the defendant's
> threats.  He would come over and ask the
> babysitter to say bad things about the
> complaining witness and she wanted no part of
> it and she refused to do it any longer.  At
> that point it was ordered that the
> complaining witness bring the child to the
> defendant.

(Tr. 502, emphasis added.)  Justice Newman did not instruct
defense counsel to forgo further questions on this topic.
Indeed, her cross-examination resumed as follows:

> Q.  [Ms. S], we left off concerning the
> visitation and how you are the person who
> actually personally brought [the boy] to his
> father on August 24th, correct?
> A.  Correct.
> Q.  How many times before August 24th
> did you have this particular arrangement
> where you were the one to bring [the boy] to
> his father?
> A.  At first we had supervised
> visitation at the babysitter's. [The boy] was
> --
> THE COURT:  The question -- You already
> told us that first it was supervised and now
> it is this system.  The lawyer is asking[:]
> before August 24th how long, how many times
> had you had this new system where you were to
> bring him directly to the father?  Do you

- 18 -

```
                   recall?
                          THE WITNESS:  No, I don't recall.
                          Q.  Well, would it be accurate to say it
                   was going on for a [--] quite a few months?
                          A.  No, it was not.
                          Q.  Well, would it be accurate to say
                   that it went on for a few weeks?
                          A.  Maybe for a few weeks.
                          Q.  Before this particular incident on
                   August 24th?
                          A.  Yes.
```

(Tr. 503-04, emphasis added.)

At Exh. D, p. 13, defendant asserts that this answer was not

entirely clear.  Making a very minor point, he notes that Ms. S

brought the boy only every other weekend, and hence perhaps

August 24 was the first time she brought the boy herself.  At the

end of page 13, he writes that "no one know[]s."  If he thought

he knew the answer to this minor question, then he could have

mentioned this later when he took the stand, and he could have

consulted the copies of the Family Court orders which the

prosecution had provided defense counsel.

On redirect, Ms. S expanded on her answer:

```
                        Q.  Why didn't you leave that day when
                   the defendant refused to come down and get
                   [the boy]?
                        A.  Because I didn't want to go against
                   the court orders.
                        Q.  Was that the first arrangement for
                   visitation with the defendant and you son?
                        A.  The first arrangement was to provide
                   supervision.
                        Q.  Where did that take place?
                        A.  The babysitter's house.
                        Q.  What happened with that arrangement?
                        A.  The babysitter didn't want anything
                   to do with him.  Every time he'd go to the
```

- 19 -

> babysitter's house to see my son, he would
> get angry and say things to her.  He was mean
> to her and she couldn't handle that, so she
> said she don't want to have anything to do
> with him again.
>         Q.  Did you have to go back to court and
> tell the [Family Court] Judge this?
>         A.  Yes.
>         Q.  And, the Judge arranged a second
> visitation [order]?
>         A.  Yes.

(Tr. 547-48.)  This testimony was an entirely permissible

response to a topic on which the defense had "opened the door,"

namely, Ms. S's motives and reasons when she personally delivered

the boy, and when she went up to defendant's apartment -- was her

state of mind fearful, or was it eager for sex?  Hearsay is

defined by Rule 801(c) of the Federal Rules of Evidence:

> "Hearsay" is a statement, other than one made
> by the declarant while testifying at the
> trial or hearing, offered in evidence to
> prove the truth of the matter asserted [by
> the declarant].

Ms. S testified that the babysitter said that Figueroa "would get

angry" and "was mean to her" and that she "don't want to have

anything to do with him again."  But those declarations were not

offered to prove the truth of what the babysitter asserted.  They

were offered to prove Ms. S's understanding that the Family Court

Judge had ordered her to deliver the boy personally.  Hence, Ms.

S's testimony was not hearsay.

In Exh. D at p. 14, Figueroa argues that this portion of the

redirect was improper because the babysitter did not "COME INTO

COURT AND TESTIFY TO AFFIRM [corroborate] HER [Ms. S's] STATEMENT AS TO WHY THE VISITATION ORDER WAS CHANGED."  The babysitter's recollections were far too collateral to require the prosecutor to bring the babysitter to the witness stand.  When the defendant testified, he was free to deny the babysitter's declarations if he felt they were important.

**Ground Three**

Ground Three alleges that the prosecution failed to turn over exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  On direct appeal, Figueroa asserted that the prosecutor withheld Family Court transcripts.  (Exh. D p. 48.) The defense did receive some of the Family Court documents shortly before trial.  (Exh. A p. 6 n. 3.)  On appeal, Figueroa said he wanted all the Family Court transcripts.  It is unclear whether the Family Court reporters ever prepared transcripts of the proceedings, or how long it would take to prepare transcripts if requested.  Figueroa did not tell the Appellate Division that he asked his attorney to request the transcripts, nor that he told his attorney that the transcripts would have contained exculpatory material.  Indeed, he did not even tell the Appellate Division what exculpatory material he thought would be contained in the transcripts.

**Ground Four**

Ground Four alleges that Figueroa's right to confrontation was violated by the prosecution's failure to disclose material that bore on a witness's credibility and by reception into evidence of hearsay testimony. Figueroa does not specify which witness he is referring to. He does not explain how Ground Four differs from Grounds Two and Three. Accordingly, my discussion of Grounds Two and Three should control here as well.

**Ground Five**

Ground Five merely states that all of the other Grounds infected his conviction on the rape count as well as his conviction on the attempted murder count. I have been considering both counts during my analysis of the other Grounds, and hence Ground Five adds nothing new.

**Ground Six**

Ground Six accuses Justice Newman of "extra-judicial conduct," namely "conducting an investigation" through "the court's investigator." Figueroa's motion to amend the habeas petition (Docket Item # 7, p. 2) makes clear that Figueroa is objecting to the following statement by the trial judge:

> I have a case aid[e] pulling all the Family
> Court petitions and order of protections. ...
> I'll give you further details when I've seen
> the documents ... .

(5/14/98 Tr. 44-45.) The judge's inquiry was appropriate, because the attorneys had asked for a *Molineux* ruling; it was

understandable that she wanted to see the primary documents about Ms. S's allegations of prior bad acts.

Mr. Cohen made the same complaint in the second 440 motion, which Justice Newman denied in a 9-page decision dated March 28, 2005. A copy of that decision is now annexed to this Report. That decision said at pages 4-5:

> Neither defendant nor the People objected to the Court's efforts to retrieve these documents or its stated intent to view them. In any event, there is no indication anywhere in the record that any Family Court petitions, orders of protection or any other document was ever actually delivered to the Court by a "case aide," or by anyone else. Rather, in at least two instances the record makes it abundantly clear that it was the Assistant District Attorney, and not a case aide or any member of the Court's staff, who provided copies of these documents to the Court and defense counsel on May 18th, 1998, and that this was the first time that the Court had seen them.

The decision then quoted from the trial transcript:

> MS. PEREZ [Assistant District Attorney]: Judge, I also obtained the Family Court petitions with respect to the '94 incident and '95 incident and those have been turned over to Ms. Calvacca [defense counsel].
> THE COURT: You have them Ms. Calvacca?
> MS. CALVACCA: Yes, Judge.
> THE COURT: May I see them?
> MS. PEREZ: Yes.

(5/18/98 Tr. 201, emphasis added by Justice Newman.) Justice Newman's Decision and Order continued:

> Later that day the Court reviewed the documents provided by the People from Family Court on the record with the parties and

– 23 –

> supplemented its ruling on the People's
> *Molineux* application with some of the
> "specifics" to which it had alluded on May
> 14th, 1998.  (*Id.* at 238-242).  The Court
> prefaced this discussion by reiterating that
> it had "reviewed the records [t]he People
> have provided from Family Court." (*Id.* at 238
> [emphasis added]).  Thus, it is apparent from
> the record that the documents in question
> were first provided to the Court and defense
> counsel by the People, during the course of
> the *Molineux* hearing, on May 18th, 1998.

For the reasons stated in detail by Justice Newman, there was no merit to the claim that is now repeated in Ground Six.

**Ground Seven**

Figueroa's final ground alleges that he received ineffective assistance of trial counsel.  The Supreme Court set the standard for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984), which announced a two-prong test.  For a court to grant a habeas petition on the ground of ineffective assistance counsel, the petitioner must: (1) overcome the strong presumption that trial counsel's conduct was reasonable and show that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms;" and (2) "affirmatively prove prejudice," and show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See id.* at 687-94.

This same claim was presented in the first 440 motion (Exh. 1) and was rejected by Justice Newman in May 2002 in a decision (Exh. A) that said (at pp. 5-6):

> ...  [D]efendant's attorney was zealous
> in advocating defendant's defense: that any
> sexual relations which occurred between
> defendant and the complainant were consensual
> and that on the date in question defendant
> was recovering from an operation and could
> not have harmed the complainant.  To that
> end, defendant's attorney made both opening
> and closing arguments to the jury, lodged
> appropriate objections during the trial,
> vigorously cross-examined each of the
> People's witnesses, made zealous and well-
> reasoned legal arguments, and, through
> defendant's testimony, presented defendant's
> version of what happened during the
> complainant's encounter with defendant.
> Additionally, at numerous junctures the
> record reveals that counsel conferred with
> defendant.  As such, defendant was not denied
> the effective assistance of counsel, and his
> motion[] for relief on these grounds is
> denied.

The claim was subsequently presented to the Appellate

Division, which wrote:

> Defendant's ineffective assistance of
> counsel claim rests primarily upon factual
> assertions that are outside the record, and
> that he made in his unsuccessful post-
> conviction motions to vacate the judgement
> pursuant to CPL 440.10.  However, since leave
> to appeal to this court was denied, these
> assertions are not properly before this Court
> [citations omitted].  The existing record
> before us establishes that defendant received
> meaningful representation.

*People v. Figueroa*, 304 A.D.2d 475, 475-76, 759 N.Y.S.2d 41, 42

(1st Dept. 2003).

Those rulings by the trial judge and by the Appellate

Division were clearly not unreasonable applications of the

Supreme Court's ruling in *Strickland*.

- 25 -

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, I recommend that Judge Daniels deny Figueroa's habeas corpus petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, (i.e. **no later than August 21, 2007**) by filing written objections with the Pro Se Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. George B. Daniels, U.S.D.J. at Room 630, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street.   Failure to file objections within 10 business days will preclude appellate review.   *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2nd Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).   Any request for an extension of time must be addressed to Judge Daniels.

DOUGLAS F. EATON
United States Magistrate Judge
Room 1360, U.S. Courthouse
500 Pearl Street
New York, NY 10007

Dated       New York, New York
            August 2, 2007

-- 26 --

Copies of this Report and Recommendation (and of Justice Newman's 3/28/05 decision) are being mailed to:

Robert Figueroa, 98-A-6081
Attica Correctional Facility
P.O. Box 149
Attica, NY 14011-0149

Lynetta St. Clair, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, NY 10451

Hon. George B. Daniels

- 27 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX: PART T-23
----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                     Respondent,

                                Ind. No. 6638/96

     -against-

                                DECISION AND ORDER

ROBERT FIGUEROA,

                    Defendant.
----------------------------------------------------------------X

NEWMAN, J.

     On September 25th, 1998, judgment was entered by this Court convicting defendant after a jury trial of attempted murder in the second degree and rape in the first degree and sentencing him to consecutive indeterminate terms of imprisonment of ten to twenty years and eight to sixteen years, respectively.

     In November 1999, defendant's application to prosecute an appeal *pro se* was granted by the Appellate Division, First Department. In October 2001, before perfecting his appeal, defendant filed a motion *pro se* before this Court to vacate his judgment of conviction pursuant to section 440.10 of the Criminal Procedure Law, which was denied by Decision and Order dated May 14th, 2002. In June 2002, defendant sought leave to appeal the denial of his post-judgment motion to the Appellate Division, First Department, and his application was denied on August 8th, 2002. On the same date that his application for leave to appeal the denial of his post-judgment motion was denied defendant filed a brief in support of the direct appeal, which he had been granted leave to prosecute *pro se* in November 1999. Defendant's direct appeal was denied and the judgment of conviction affirmed by the Appellate Division in a decision dated April 24th, 2003. *People v Figueroa*, 304 A.D.2d 475 (1st Dep't 2003). Defendant's application for leave to appeal *pro se* to the Court of Appeals was also denied. *People v Figueroa*, 100 N.Y.2d 5651 (2003).

     In April 2004, defendant, through counsel, sought relief from his judgment of conviction by petition to the United States District Court for the Southern District of New York for a writ of *habeas corpus*. The People opposed, arguing, *inter alia*, that all of defendant's claims lacked merit and that he had failed to exhaust some of them in state court. In September 2004, defendant filed

a motion to amend his petition by adding one new claim, to wit, that this Court had deprived him of his right to a fair trial before an impartial tribunal by "caus[ing] petitioner's case files at the Family Court to be investigated." (Defendant's Exhibit C ["Amended Petition Pursuant To 28 U.S.C. §2254"] at 6). By Memorandum and Order dated November 9th, 2004, Hon. Douglas F. Eaton, United States Magistrate Judge found that this new claim had not been presented first to the state courts and stayed defendant's petition in order to permit him to return to state court to exhaust the new claim there.

By Notice of Motion dated November 17th, 2004, defendant now moves to vacate the judgment of conviction on the ground that he was deprived of his right to a fair trial because this Court "investigated defendant's Family Court files by, either obtaining the files themselves for review, or causing her law secretary, to review the Family Court files." (Affirmation of Ronald Cohen, Esq. at 3). This ground was not raised by defendant in his October 2001, C.P.L. § 440.10 motion or upon the direct appeal which defendant perfected in August 2002. The People oppose, contending, inter alia, that defendant's claim lacks merit and is procedurally barred pursuant to C.P.L. § 440.10 (2) (c) and (3) (c). In reply, defendant essentially reiterates the argument posed in his motion papers except to rephrase a single point. Defendant contends in reply that "[t]he Court, in obtaining the Family Court records, committed reversible error." (Reply Affirmation of Ronald Cohen, Esq. at 2 [emphasis added]).

The Court has reviewed the applicable law and the following documents: (1) defendant's Notice of Motion dated November 17th, 2004; (2) defendant's attorney's Affirmation in support dated November 17th, 2004; (3) defendant's Exhibit A, entitled "Petition Pursuant To 28 U.S.C. §2254 By A Person In State Custody For A Writ Of Habeas Corpus"; (4) defendant's Exhibit B, entitled "Memorandum and Order," of Hon. Douglas F. Eaton, United States Magistrate Judge; (5) defendant's Exhibit C, entitled "Amended Petition Pursuant To 28 U.S.C. §2254 By A Person In State Custody For A Writ Of Habeas Corpus"; (6) defendant's Exhibit D, an excerpt of the stenographic minutes of the pre-trial proceedings on "May 14th, 1999" [sic]; (7) People's Affirmation in Opposition dated December 30th, 2004; (8) People's Memorandum of Law; (9) People's Exhibit 1, excerpts of the stenographic minutes of the pre-trial proceedings on "May 12th, 1998," "May 13th, 1998" and "May 14th, 1999" [sic], and; (10) defendant's attorney's Reply Affirmation dated March

2

11th, 2005. In addition the Court has reviewed the transcript of the stenographic minutes of the entire proceeding (hereafter, "Trans.") including pre-trial hearings, jury selection, witness testimony, colloquy, verdict and sentencing.

Upon consideration of all of the foregoing, and for the reasons that follow, the motion is denied.

## Factual and Procedural Background

On August 24th, 1996, in defendant's apartment in the building at 110 East 177th Street, Bronx, New York, defendant had sexual intercourse by forcible compulsion with the female complainant, Ms. S.[1]; then he attempted to kill Ms. S. by choking her and covering her face with plastic. At the time of the crimes, defendant and Ms. S. had been involved in a long-standing relationship. They had lived together in the past and they had had a child together; the child was five years old at the time of trial in May 1998. In his testimony before the grand jury and in other statements, defendant maintained that he had not attacked Ms. S., and that she had fabricated the accusations in retaliation for his efforts to gain custody of their child.

Prior to the commencement of trial the People made a *Molineux* (*People v Molineux*, 168 N.Y. 264 [1901]) application that they be permitted to introduce on their direct case evidence of prior incidents in which, they alleged, defendant had attacked or threatened Ms. S. The People argued that such evidence was admissible to show defendant's motive, to negate the motive to fabricate which defendant ascribed to Ms. S. in his statement to the police, i.e., a custody battle, to establish the parameters of their relationship and to complete the narrative. Defendant objected to the admission of this evidence. A hearing on the People's *Molineux* application was commenced on May 13th, 1998, at which time the People called Ms. S., who testified of a series of incidents in which defendant had physically attacked her between October 15th and November 21st, 1995, and threatened to "blow up" Ms. S. and their child in January 1996. (*See* Trans., May 13th, 1998, at 23-28). According to Ms. S. she sought and was issued an order of protection from Family Court in

---

[1]     For privacy, complainant shall be referred to hereinafter as "Ms. S."

3

November 1995, and filed a criminal complaint and was issued another order of protection against defendant in January 1996. (*Id.*)

On May 14th, 1998, the Court rendered its preliminary decision from the bench, granting the People's application in part and reserving in part. The Court, *inter alia*, held that evidence of defendant's prior uncharged acts testified to by Ms. S. was generally admissible to prove defendant's motive and intent to kill under count one, attempted murder. It was also held relevant to prove defendant's use of forcible compulsion and Ms. S's. lack of consent under the rape and sodomy charges. It was relevant to assist the People in negating defendant's statements to police that the charges were fabricated by Ms. S. due to an ongoing custody dispute. It also provided the jury with a more complete picture of the parties' relationship and completed the narrative. The Court found that the probative value of the evidence outweighed its prejudicial impact. (*See generally* Trans., May 14th, 1998, at 47-52). The Court indicated, however, that it wanted more information, including further testimony from Ms. S.,[2] before rendering its decision as to precisely which details of these prior acts the People would be permitted to show.

The Court said,

> I have a case aide pulling all of the Family Court petitions and order of protections. . . . I'm going to give the decision now on the Molin[eux] issue, the actual specifics of what aspects of this that will be permitted to be presented by the People on their direct case. I'll give you further details when I've seen the documents to know what it is specifically that we are talking about.

(*Id.* at 44-45).[3]

Neither defendant nor the People objected to the Court's efforts to retrieve these documents or its stated intent to view them. In any event, there is no indication anywhere in the record that any Family Court petitions, orders of protection or any other document was ever actually delivered to the Court by a "case aide," or by anyone else. Rather, in at least two instances the record makes it abundantly clear that it was the Assistant District Attorney, and not a case aide or any member of the

---

[2]     Ms. S's. further testimony was to include, but was not to be limited to, an incident which the People represented occurred in September 1994, but which had not been addressed when Ms. S. testified on May 13th, 1998.

[3]     The Family Court petition filed and the order of protection issued as a consequence of the September 1994 incident were among those to which the Court referred herein.

4

Court's staff, who provided copies of these documents to the Court and defense counsel on May 18th, 1998, and that this was the first time that the Court had seen them.[4]

> MS. PEREZ [Assistant District Attorney]: Judge, I also obtained the
> Family Court petitions with respect to the '94 incident and '95
> incident and those have been turned over to Ms. Calvacca [defense
> counsel].
> THE COURT: You have them Ms. Calvacca?
> MS. CALVACCA: Yes, Judge.
> THE COURT: May I see them?
> MS. PEREZ: Yes.

(Trans., May 18th, 1998, at 201[*emphasis added*]).

Later that day the Court reviewed the documents provided by the People from Family Court on the record with the parties and supplemented its ruling on the People's *Molineux* application with some of the "specifics" to which it had alluded on May 14th, 1998. (*Id.* at 238-242). The Court prefaced this discussion by reiterating that it had "reviewed the records [t]he People have provided from Family Court." (*Id.* at 238 [*emphasis added*]). Thus, it is apparent from the record that the documents in question were first provided to the Court and defense counsel by the People, during the course of the Molineux hearing, on May 18th, 1998.

Still later on May 18th, 1998, immediately following the conclusion of jury selection and prior to the giving of preliminary instructions, the *Molineux* hearing was continued and concluded with additional testimony from Ms. S. about a September 1994, incident. (*Id.* at 373-375). Following Ms. S's. testimony on May 18th, 1998, the Court concluded its decision on the People's *Molineux* application. (*Id.* at 375). At trial Ms. S's. testimony of the September 1994, October through November 1995, and January 1996 incidents was received without further objection. (*Id.* at 421-424). Defendant declined the Court's offers to instruct the jury as to the proper use of evidence of prior uncharged crimes and bad acts in both its preliminary (*id.* at 375) and final (*see* Trans., May 26th, 1998, at 674) charges.

---

[4] The only other materials which the Court had occasion to view were documents which the People submitted for *in camera* review at the conclusion of jury selection in satisfaction of their disclosure obligations, consisting of crime victim reports, Social Services records of Ms. S., police reports and orders of protection. The record is clear that these were supplied by the People and that these are not the documents about which defendant now complains. (*See* Trans., May 18th, 1998, at 370-371).

5

## Discussion

Defendant's instant motion to vacate the judgment of conviction must be summarily denied since as to the ground raised therein, sufficient facts appeared upon the record of the proceedings to have permitted adequate appellate review but for defendant's unjustifiable failure to raise such ground on an appeal that he actually perfected. C.P.L. § 440.10 (2) (c); *People v Jackson*, 266 A.D.2d 163 (1st Dep't 1999) ("A 440.10 motion may not be used as a device to take a belated appeal on an issue that appears on the face of the record [*citing People v Cooks*, 67 N.Y.2d 100 (1986)]."). Indeed, defendant's argument is based solely and entirely on the Court's comment <u>on the record</u> that it had "a case aide pulling all of the Family Court petitions and order of protections," and defendant does not allege the existence of any facts *dehors* the record which would augment his contention that he was thereby deprived of a fair trial. Nor does defendant proffer any reason for his failure to raise this ground on his previously perfected appeal. Consequently, the instant motion must be summarily denied. C.P.L. § 440.10 (2) (c).[5]

Moreover, since the ground underlying the instant motion is entirely record-based it is also summarily denied because upon his previous motion made pursuant to C.P.L. § 440.10 defendant "was in a position adequately to raise the ground . . . but did not do so." C.P.L. § 440.10 (3) (c).

Furthermore, to the extent defendant contends that "[t]he Court, <u>in obtaining the Family Court records</u>, committed reversible error" (Reply Affirmation of Ronald Cohen, Esq. at 2 [emphasis added]), his motion is denied on the merits without a hearing since such claim "is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts." C.P.L. § 440.30 (4) (b). A defendant seeking to vacate a judgment of conviction has the burden of coming forward with allegations sufficient to create an issue of fact. *See People v Session*, 34 N.Y.2d 254, 255-256 (1974). Mere conclusory allegations of ultimate facts, such as that contained in counsel's Reply Affirmation, will

---

[5]    Furthermore, the Court notes that even if defendant had raised it upon appeal this claim was probably not preserved for appellate review in any event, since defendant failed to make a contemporaneous objection either to the Court's comment that it was attempting to obtain the documents in question or to Ms. S's. trial testimony of the prior incidents. *See People v Charleston*, 56 N.Y.2d 886 (1982) (despite objections to Trial Judge's specific questions of witnesses, defendant's failure to object to Judge's general course of action or to move for mistrial precluded appellate review of claim); *People v Morris*, ___ N.Y.2d ___, 788 N.Y.S.2d 853 (1st Dep't 2005).

6

PAGE   08/10

not suffice. The movant must provide the Court with supporting evidentiary facts. *See People v Session*, 34 N.Y.2d at 256; *People v Baptiste*, 306 A.D.2d 562, 569 (3d Dep't 2003).

An essential fact which is indispensable to the viability of this claim is that the Court actually obtained the documents in question through the efforts of a "case aide." Yet, there are no sworn allegations contained in defendant's moving papers which substantiate or even tend to substantiate this essential fact. Nor for that matter is there any factual support for defense counsel's conclusory and patently erroneous assertion that "[t]he Court's decision was based on documents it obtained outside the *Molineux* hearing." (Reply Affirmation of Ronald Cohen, Esq. at 4). Indeed, to the contrary the record establishes irrefutably that these documents were simultaneously provided to the Court and defense counsel by the People in open court as part of the *Molineux* hearing, and that this was the first time that the Court had seen them. (*See* Trans., May 18th, 1998, at 201 and 238). Defendant has, therefore, failed to satisfy his burden.

Finally, defendant's motion to vacate the judgment of conviction is denied without a hearing because the moving papers do not allege a ground constituting a legal basis for the motion; in other words, defendant's claim is meritless. C.P.L. § 440.30 (4) (a). Since the Family Court petitions and orders of protection were never retrieved by, delivered directly to, or produced exclusively for, the Court or any member of her staff, the crux of defendant's argument on the instant motion is that the mere fact of any effort by the Court to try to obtain them was improper, *per se*. However, the Court's efforts neither exceeded the bounds of permissible judicial intervention nor deprived defendant of his right to a fair trial.

As the Court of Appeals has said, "[a]s a practical matter, trial courts sometimes must take a more active role in the presentation of evidence in order to clarify a confusing issue or to avoid misleading the trier of fact (citations omitted)." *People v Arnold*, 98 N.Y.2d 63, 67 (2002). This Court's action constituted nothing more than an effort to clarify the issues presented upon, and to better inform its consideration of, the People's *Molineux* application so as to enable the Court to render a determination that would protect defendant's constitutional rights without misleading the

7

jury.[6] The Court did not thereby "take on either the function or appearance of an advocate at trial (citations omitted)," and cross the line of permissible judicial intervention. *People v Arnold*, 98 N.Y.2d at 67. *Compare, e.g., In re VonderHeide*, 72 N.Y.2d 658, 659 (1988) (town justice, *inter alia*, "routinely sought out and interviewed witnesses outside of court and made judgments based on their unsworn *ex parte* communications"); *People v Chatman*, 14 A.D.3d 620 (2d Dep't 2005) (trial judge elicited inadmissible information from People's witness and questioned defendant's alibi witness extensively); *People v Tucker*, 89 A.D.2d 153 (1st Dep't 1982) (questioning of witnesses by trial judge supplied evidence necessary to the People's case); *People v Brown*, 38 A.D.2d 651 (3d Dep't 1971) (defendant denied opportunity to participate in trial judge's investigation of alleged juror misconduct).

Moreover, the Court is unaware of any authority, and defendant cites none, which would support the proposition that the production of official records at the request of a trial judge, much less the mere request itself made prior to the start of trial, is in any way improper. Indeed, the judicial conduct at issue in each of the six decisions which defendant does cite was overtly activistic, and clearly entailed an intervention far greater than and different in kind from that of which defendant now complains. Yet, in three of those decisions it was determined that the judicial conduct at issue fell <u>within</u> the bounds of permissible judicial intervention, *i.e.*, *Daye v Attorney General of the State of New York*, 712 F.2d 1566 (2d Cir. 1983) (trial judge conducted extensive, pro-prosecution, examinations of witnesses, including defendant, in presence of jury), *Francolino v Kuhlman*, 224 F. Supp. 2d 615 (S.D.N.Y. 2002) (trial judge questioned witnesses and made disparaging remarks to and about defendant and his attorney in presence of jury) and, *Salahuddin v Strack*, 1998 WL 812648 (E.D.N.Y. 1998) (trial judge made disparaging comments in presence of jury about defense counsel's attempts to cross-examine witnesses). Clearly, therefore, this Court's action, which was positively abstinent in comparison, fell well short of the conduct in those cases.

---

[6]    Although there is no indication in the record that the Court intended for its law secretary to review the documents the instant motion is phrased as if the possibility that the Court "caused" her law secretary to do so constituted an alternative ground for relief. (*See* Affirmation of Ronald Cohen, Esq. at 3). If this is defendant's contention it too is meritless. A trial judge does not "compromise [a] defendant's constitutional rights to due process, confrontation [or] an impartial fact-finder" by discussing the case, or any issue arising therein, with her law secretary. *See People v Rafael N.*, 176 A.D.2d 207 (1st Dep't 1991).

## Conclusion

Neither the Court's attempt to obtain nor its stated intent to view the Family Court petitions and orders of protection deprived defendant of his right to a fair trial. Rather, the Court's action constituted a valid effort to protect the rights of defendant by clarifying an important and complicated issue, effectuate a constitutionally sound determination of the People's application and avoid misleading the jury. In any event, defendant unjustifiably failed to pursue available avenues of review, both by prior post-conviction motion to vacate and direct appeal, of the ground he now seeks to raise. But C.P.L. article 440 is not an adjunct to, nor substitute for, the appeal process. *See People v Jackson, supra.* Nor has defendant proffered any lawful reason why the judgment of conviction entered after a jury trial should now be vacated.

Accordingly, for all of the foregoing reasons, defendant's motion to vacate his judgment of conviction is denied in its entirety.

The foregoing constitutes the decision and order of the Court.

Dated: Bronx, New York
   March 2*8*, 2005

E N T E R:

HON. BARBARA F. NEWMAN, A.J.S.C.

RONALD COHEN, ESQ.
Attorney for Defendant
Suite 1305
111 Broadway
New York, New York 10006

A.D.A. LYNETTA M. ST. CLAIR
Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, New York 10451

9